# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9379 | **DATE** | 9/9/2004 |
| **CASE TITLE** | Michael Simmons vs. Village of Willow Springs | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due _____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set out in the Memorandum Opinion and Order, Defendant's Motion for Summary Judgment [18-1] is denied. Status in this matter is set for 9/24/04 at 9:30 a.m. Enter Memorandum Opinion and Order. *Geraldine Soat Brown*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | SEP 1 0 2004 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| yp | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number

34

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

!SEP 1 0 2004

MICHAEL SIMMONS,                )
    Plaintiff,                )          Case No. 02 C 9379
                                  )
v.                             )
                                  )          Magistrate Judge Geraldine Soat Brown
VILLAGE OF WILLOW SPRINGS,      )
    Defendant.                    )
                                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Simmons ("Simmons") brought this action against Defendant Village of

Willow Springs ("Willow Springs") alleging that Willow Springs discriminated against him on the

basis of his race (African American) when it failed to hire him as a part-time police officer in

violation of Title VII, 42 U.S.C. § 2000e-5(f)(3). (Compl. ¶ 1 [dkt 1]; Pl.'s LR Resp. ¶ 1 [dkt 26].)

Willow Springs has moved for summary judgment. [Dkt 18.] The parties have consented to the

jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 12, 13.] For

the reasons set forth below, Willow Springs' motion for summary judgment is denied.

### FACTUAL BACKGROUND[1]

#### A.   The Application Process with the Willow Springs Police Department

Applications for employment with the Willow Springs police department are accepted on a

rolling basis. (Def.'s LR Resp. ¶ 20.) One officer with the Willow Springs police department,

---

[1] The following facts are taken from the parties' responses to the respective statements of
fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pl.'s LR Resp. ¶ ___" [dkt 26],
"Def.'s LR Resp. ¶ ___" [dkt 28], and from the exhibits submitted with those statements or
responses to those statements, which are cited herein as: "Pl.'s LR App. Ex. ___" [dkt 26] and
"Def.'s LR App. Ex. ___" [dkt 19].

Phillip Wiseman, testified that openings for part-time officer positions at Willow Springs are "continual" and that the Chief of Police, Jerome Schultz, was "constantly bringing in part-time police officers . . . to fill in voids" caused by "a lack of manpower." (Pl.'s LR App. Ex. E, Phillip Wiseman Dep. at 21-22; Pl.'s LR Stmt. ¶ 20.)[2] Wiseman stated that part-time positions were offered not on the basis of how many were open, but on the basis of "whom [the Chief] wanted," because there was no "set number of positions." (Wiseman Dep. at 33.)

The first step in applying for a part-time police officer position, according to Chief Schultz, was to fill out an application. ( Schultz Dep. at 42-43.) Due to the "financial bind" Willow Springs was in, the police department preferred applicants who had received state certification and prior training. (Schultz Dep. at 45; Pl.'s LR Stmt. ¶ 17; Def.'s LR Resp. ¶ 17.) After an application was submitted, it was forwarded to Chief Schultz, regardless of whether it had been dropped off at the village hall or the police department. (Schultz Dep. at 44.) Next, either Schultz or someone on his staff would conduct a background/criminal check of the applicant. (Schultz Dep. at 44-46; Def.'s LR Resp. ¶ 31.) In addition, if the applicant had taken any of the tests required for applicants for full-time employment, such as agility, general aptitude, or physical fitness tests, those scores would be verified. (Schultz Dep. at 38-39, 45.) After the background check, if the candidate was still eligible, Schultz would set up and conduct an interview of the candidate. (*Id.* at 46; Def.'s LR Resp. ¶ 32.)

Following the interview, Schultz would determine if the candidate was "qualified" or not. (Schultz Dep. at 47.) If the candidate was "qualified," Schultz would recommend the person to the

---

[2] Chief Schultz was the Chief of Police from 1996 to approximately December 2002. (Pl.'s LR App. Ex. B & Def.'s LR App. Ex. D, Jerome Schultz Dep. at 9-10, 52.) Schultz will be referred to herein as "Schultz," "Chief Schultz," or "the Chief."

Police and Fire Committee (Schultz Dep. at 47-49; Def.'s LR Resp. ¶ 34), who, in turn, would make a recommendation to the Village Board based on Schultz's recommendation. (Schultz Dep. at 49; Pl.'s LR Stmt. ¶ 36.)[3] According to Schultz, he alone had the authority to make recommendations with respect to candidates. (Def.'s LR Resp. ¶ 38; Schultz Dep. at 47-48, 51-52.) If Schultz did not deem an individual to be qualified (and thus did not give his recommendation), that person's application would not be forwarded to the Police and Fire Committee or, in turn, to the Village Board, and therefore the applicant could likely never be offered a position. (Def.'s LR Resp. ¶ 37; Schultz Dep. at 50; Def.'s Mem. at 6.) Gary Carr, a former Willow Springs police officer, testified that when the Chief made a recommendation to the Board regarding hiring, that recommendation was basically "rubber stamp[ed]." (Pl.'s LR App. Ex. G, Gary Carr Dep. at 21-22.) However, Schultz testified that the Police and Fire Committee (whose Chairman is part of the Village's Board of Trustees) was the entity ultimately responsible for the hiring of part-time officers. (Def.'s LR Stmt. ¶ 14; Schultz Dep. at 41, 48; Wiseman Dep. at 34.)[4]

**B.    Simmons' First Application for Employment**

In December 2001, Simmons submitted an application for part-time employment with the Willow Springs police department. (Pl.'s LR Resp. ¶¶ 3, 13; Pl.'s LR App. Ex. A & Def.'s LR App.

---

[3]  Willow Springs disputes that statement (although it accurately reflects Schultz's testimony), and relies instead on other testimony by Schultz that his recommendation would "go" to the Chairman of the Police and Fire Committee. (Def.'s LR Resp. ¶ 36.) The court will construe this fact and draw all reasonable and justifiable inferences in favor of the non-moving party, Simmons.

[4]  As will be discussed further herein, Simmons asserts that Chief Schultz, not the Village Board, made the final hiring decisions regarding police officers. (Pl.'s LR Resp. ¶ 10)

Ex. C, Michael Simmons Dep. at 25, 28.) Simmons gave the application to Officer Wiseman, whom he had met during a prior job. (Simmons Dep. at 18, 26-27; Wiseman Dep. at 45.) Wiseman testified that Simmons included the necessary diplomas with his application. (Wiseman Dep. at 25, 47.) Wiseman further testified that he (Wiseman) took the employment application to Chief Schultz's office and "hand[ed] it to him." (Pl.'s LR Stmt. ¶ 22; Wiseman Dep. at 25-27, 44-45.)[5]

Wiseman testified that Chief Schultz later told Wiseman that he (Schultz) had left a message for Simmons regarding his application. (Wiseman Dep. at 28, 45-46.) Some time thereafter, Simmons advised Wiseman that he had not heard anything regarding his application. (*Id.* at 28.) When Wiseman advised him that Chief Schultz had left a message for him, Simmons replied that he had not received any messages from Schultz. (*Id.* at 28.) Wiseman told Simmons that he would check into the matter with Schultz. (*Id.* at 28-29.) Wiseman later asked Schultz what was going on with Simmons' application, and Schultz indicated that he had either misplaced it or lost it. (*Id.* at 29.)[6]

## C.    Simmons' Second Application for Employment

On approximately January 14, 2002, Simmons filled out a second application for part-time employment with Willow Springs. (Pl.'s LR Resp. ¶ 4; Simmons Dep. at 29-30; Wiseman Dep. at 36-37; Def.'s Mem. at 1.) Simmons did not tender his application directly to Schultz. (Pl.'s LR Resp. ¶ 6.) Instead, he again submitted it to Wiseman in the lobby of the Willow Springs police

---

[5] Willow Springs admits that Wiseman testified as set forth above, but denies that Chief Schultz ever received Simmons' application. (Def.'s LR Resp. ¶ 22.)

[6] Willow Springs denies that statement, but without citing any contradictory evidence. (Def.'s LR Resp. ¶ 23.)

4

station. (*Id.* ¶ 5; Simmons Dep. at 29-30, 35-36.) The application was then handed to Lieutenant John Lynn. (Pl.'s LR Resp. ¶ 4; Def.'s LR Resp. ¶ 24; Simmons Dep. at 38; Pl.'s LR App. Ex. D, John Lynn Dep. at 25.)[7] According to Wiseman, Lynn reviewed the application and concurred that the documents which were needed to show state certification were present. (Wiseman Dep. at 47, 50.) Lynn testified that he then either "handed it to [Chief Schultz] personally or put [it] in his office or . . . handed it to his aide to put it in his office, one or the other, because [employment applications] were all forwarded to [Chief Schultz's] office." (Def.'s LR Resp. ¶ 25; Lynn Dep. at 26; Wiseman Dep. at 36-37.)

Willow Springs admits that Lynn testified that he gave Simmons' application to Chief Schultz, but denies that Chief Schultz ever received the application. (Def.'s LR Resp. ¶ 25.) Schultz testified that he never "receive[d] an application for either part-time or full-time employment of Michael Simmons" and has no recollection of "the name of Michael Simmons on any application." (Def.'s LR Stmt. ¶ 16; Schultz Dep. at 71-72.) Schultz further testified that he does not recall ever being approached by Lynn regarding Simmons. (Schultz Dep. at 72; Def.'s LR Stmt. ¶ 28.) Lynn believes Schultz received Simmons' application based on a conversation between them wherein Lynn commented that Simmons seemed like a pretty good guy and Schultz "acknowledged what [he] said." (Pl.'s LR Stmt. ¶ 26; Lynn Dep. at 29-30.)

Wiseman then took Simmons on a tour of the police department building. (Simmons Dep. at 36; Wiseman Dep. at 32.) Wiseman and Simmons state that during this tour, Simmons met Chief

---

[7] Although Lynn testified that it was Wiseman who handed him the application, Wiseman testified that it was Simmons who handed Lynn the application. (Wiseman Dep. at 30-31.) Thus, while both Lynn and Wiseman agree that the application was handed to Lynn, they do not agree who actually handed it to Lynn. That is not a material issue.

Schultz, as well as Lieutenant Lynn. (Simmons Dep. at 36-37, 59; Wiseman Dep. at 36.) As he was leaving the building, Simmons ran into the Chief again in the parking lot. (Simmons Dep. at 39-40.) Lynn and Wiseman were also there, along with Bobby Sims, another Willow Springs police officer. (Simmons Dep. at 40; Wiseman Dep. at 38-39; Pl.'s LR Stmt. ¶ 27.) According to Simmons, during their encounter, Schultz asked Simmons whether he would be available to work weekends and holidays. (Simmons Dep. at 40-41, 59.) Simmons responded that he would be available. (*Id.* at 42.)

Sims testified that he heard Schultz tell Simmons in the parking lot that he was "going to hire him." (Pl.'s LR App. Ex. F, Bobby Sims Dep. at 23.) Wiseman similarly testified that Schultz told Simmons in the parking lot that he intended to hire him and would call him. (Wiseman Dep. at 38-39.) Willow Springs disputes that testimony, arguing that Simmons never even had a formal interview with Schultz. (Simmons Dep. at 80, 85-86; Def.'s LR Resp. ¶ 27.)

Simmons testified that approximately one week after the tour, he called Schultz to check on the status of his application. (Pl.'s LR Resp. ¶ 6; Simmons Dep. at 42-43.) He was advised by Chief Schultz that he would be hired after some badges "come in." (Pl.'s LR Resp. ¶ 6; Simmons Dep. at 43, 59.) Simmons told Schultz that he would check back with him, and proceeded to call him again approximately one month later. (Simmons Dep. at 44-46.) During that conversation, Schultz told Simmons that some of his full-time officers were going to be moved into part-time slots. (*Id.* at 47-48, 60.)[8] Simmons responded that he would check back with Schultz again, but admits that he never did. (*Id.* at 48, 60.) During that time period, Wiseman also followed up with Schultz and Lynn regarding Simmons' application. (Wiseman Dep. at 41-43.) He testified that he made

---

[8] Schultz subsequently testified that his goal had been to "do away" with part-time officer positions but that that goal had been "shelved" and part-time positions were still considered "desirable" after he met Simmons. (Pl.'s LR Stmt. ¶ 21; Schultz Dep. at 60-61.)

approximately twelve inquires regarding Simmons' application – six to Lynn and six to Schultz. (*Id.* at 43; Pl.'s LR Stmt. ¶ 29.)[9] According to Wiseman, "every time [he] tried to inquire with the chief, he never had time." (Wiseman Dep. at 41-42; Pl.'s LR Stmt. ¶ 28.)

Simmons concedes that he has no direct knowledge that Chief Schultz ever received his employment applications. (Pl.'s LR Resp. ¶ 6.) Simmons also concedes that he never had a formal interview with the Willow Springs police department. (*Id.* ¶ 7.) He asserts, however, that he had an informal interview with Chief Schultz during his tour of the facility with Wiseman. (Pl.'s LR Stmt. ¶ 15.) Wiseman, however, who was with Simmons during that meeting, testified that Simmons did not have a formal interview with the Chief that day, and that it was basically just a "meet and greet." (Wiseman Dep. at 37-38.) Likewise, Chief Schultz testified that he never conducted an interview of Simmons, although he testified regarding an informal face-to-face meeting they had in his office. (Def.'s LR Stmt. ¶ 15; Schultz Dep. at 55-56, 71.)

**D.     Simmons' Background and Qualifications**

Simmons became certified to be a police officer in Illinois in 1997, after attending the Northeastern Metropolitan Regency Training Agency for a year. (Def.'s LR Resp. ¶¶ 18, 19; Simmons Dep. at 14-15.) He began working as a part-time police officer with the Village of Summit at that time. (Simmons Dep. at 14.) Prior to that, Simmons had worked for two years as a part-time police officer with the Robbins police department. (Def.'s LR Resp. ¶ 19; Simmons Dep. at 15-16.)

At the time he submitted his employment applications with Willow Springs, Simmons was still working as a part-time police officer with the Village of Summit, and was also working full time

---

[9]     Willow Springs disputes that statement, but without citing any contradictory evidence. (Def.'s LR Resp. ¶ 29.)

at a company called Consolidated Freight, which appears to be a trucking company. (Simmons Dep. at 14, 61-62; Wiseman Dep. at 37.)

**E.  Hiring of Other Police Officers**

Simmons admits that has no direct knowledge as to whether any part-time officers were hired after he submitted his applications for employment because he never inquired into that issue. (Simmons Dep. at 75; Pl.'s LR Resp. ¶ 8; Def.'s LR Stmt. ¶ 8.) He asserts, however, that he learned from some unidentified "other officers" that at least five other police officers were hired after he submitted his applications. (Pl.'s LR Resp. ¶ 8; Pl.'s LR App. Ex. C, Letter from Simmons dated Aug. 31, 2002 at 1.) He does not state whether those officers were part-time or full-time. Wiseman testified that at least three part-time officers were hired several months after Simmons submitted his applications and that all of them were Caucasian. (Wiseman Dep. at 41-42.) He testified that he "had no idea that the other applicants were in the pipeline to come through." (*Id.* at 43.) Chief Schultz testified that he believed two part-time police officers had been hired during the time period in which Simmons applied, although he could only pinpoint that time frame as being sometime after August 2001. (Pl.'s LR Resp. ¶ 8; Schultz Dep. at 61-62.) Chris Limas, the Village Administrator for Willow Springs who worked with Schultz for two and a half years prior to Schultz's retirement in December 2002, testified that he recalls only one part-time officer being hired by Schultz after he (Limas) came on board in 2000, and stated that that person was hired around November 2001. (Def.'s Reply Ex. E, Chris Limas Dep. at 5, 35-37, 40; Schultz Dep. at 9.)

When Chief Schultz became Chief of the Willow Springs police department in 1996, there were no African American police officers in the department. (Pl.'s LR Resp. ¶ 11.) Chief Schultz

testified that he is not aware of any African American police officers who worked for Willow Springs between 1970 and 2002. (*Id.* ¶ 12.) Chief Schultz testified that, other than Simmons, during his tenure as Chief between 1996 and 2002 only two African Americans ever applied for a position with the Willow Springs police department, one who later withdrew from consideration, and another who accepted a position elsewhere before being interviewed. (Def.'s LR Stmt. ¶ 17; Schultz Dep. at 74-76.)

## F.  Other Evidence of Alleged Discriminatory Conduct[10]

Wiseman and Sims provided affidavits stating that they once heard Schultz say "I will never hire a Nigger." (Pl.'s LR App. Ex. H, Phillip Wiseman Aff. at 1; Pl.'s LR App. Ex. I, Bobby Sims Aff. at 1; Pl.'s LR Stmt. ¶¶ 40-41; Wiseman Dep. at 54.) Wiseman asserted that he had heard the comment approximately four years earlier; Sims asserted that he had heard the comment approximately one year earlier (which would have been about eight months after Simmons submitted his applications). (Wiseman Aff. at 1; Sims Aff. at 1.) Sims also testified that Schultz had commented, on several occasions, that his officers should be "careful pulling over ghetto cruisers," which Sims interpreted to mean that they should target African Americans. (Sims Dep. at 40, 57; Pl.'s LR Stmt. ¶ 43; Wiseman Dep. at 55, 71.) Wiseman testified that Schultz once told his officers to "make sure you're careful with a car full of coal," which he interpreted to mean a car full of African Americans. (Wiseman Dep. at 55, 71; Pl.'s LR Stmt. ¶ 44.) Carr provided an affidavit

---

[10] The court recognizes that some of the statements attributed to Chief Schultz are of a deeply offensive nature, and that Chief Schultz vehemently denies making those statements. They are reluctantly quoted here only because the court believes that an appropriate analysis of the defendant's motion requires consideration of the actual unvarnished evidence.

stating that Schultz had told him that fees were assessed in conjunction with employment applications in order to "keep the UPS (United Postal Service) Niggers out of here." (Pl.'s LR App. Ex. J, Gary Carr Aff. at 1; Pl.'s LR Stmt. ¶ 42.)[11] Schultz denied making any of those statements. (Schultz Dep. at 77-78, 83; Def.'s LR Resp. ¶¶ 40-44.) In addition, Sims testified that he believed Chief Schultz encouraged and/or condoned racial profiling. (Sims Dep. at 64.) Lisa Gardner, a Willow Springs police officer, testified that she believed it was Schultz's intent to have African American individuals in Willow Springs arrested. (Pl.'s LR App. Ex. K, Lisa Gardner Dep. at 7, 52; Pl.'s LR Stmt. ¶ 46.) Schultz denied that, as well. (Schultz Dep. at 80-84; Def.'s LR Resp. ¶ 46.) Gardner further testified that Schultz once stated that "those type of people are not going to disrupt my town," which she interpreted to mean African Americans. (Gardner Dep. at 45, 53; Pl.'s LR Stmt. ¶ 47.) Willow Springs disputes Gardner's interpretation of that statement. (Def.'s LR Stmt. ¶ 47.) Limas testified that he is unaware of Schultz ever having stated that he would never hire an African American or making any other comment that would demean someone's race. (Limas Dep. at 32, 40.) Lynn similarly testified that he never heard Schultz say that he "would never hire a nigger" or use a term like that. (Lynn Dep. at 21.) He further testified that he never heard Schultz make a comment regarding "keep[ing] the UPS niggers out of here" or any other racial remarks, and he believed that Schultz had no racial animus towards African Americans. (*Id.* at 21, 22, 32.) Simmons testified that he has no knowledge of Willow Springs having ever engaged in any racial discrimination or racial profiling. (Simmons Dep. at 57.)

---

[11] There was testimony to the effect that a UPS facility was located near the Willow Springs police department, and that a number of African Americans were employed there. (Schultz Dep. at 81-83; Wiseman Dep. at 55.) Schultz denied that there was a proportionately large number of African Americans who worked at the UPS facility or that he paid attention to the percentage of African Americans who worked there. (Schultz Dep. at 82.)

All of the officers who testified that Schultz made racially demeaning comments (Wiseman, Sims, Carr and Gardner) have or had their own lawsuits pending against Chief Schultz, Willow Springs, or both. (Limas Dep. at 29-31; Gardner Dep. at 29, 37.) Schultz testified that there had been "animosity" between himself and Carr, Wiseman, and Sims for some time. (Schultz Dep. at 69-70.) Lynn corroborated that testimony, stating that, in his opinion, Wiseman and Sims "hated" Chief Schultz, and there was "animosity" between Carr and Schultz. (Lynn Dep. at 32, 33.)

## G.   Simmons' EEOC Charge and Complaint

On September 3, 2002, Simmons filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). (Def.'s Answer ¶ 5.) [Dkt 6.] The parties initially agreed that the EEOC issued a notice of right to sue on December 10, 2002. (*Id.* ¶ 6.)[12] On December 24, 2002, Simmons filed this lawsuit requesting among other relief, compensatory and punitive damages, attorney's fees and costs, and an injunction enjoining Willow Springs from engaging in racial harassment and discrimination. (Compl. at 2-3.) [Dkt 1.] In its answer to the complaint, Willow Springs did not admit that Simmons had timely filed his charge with the EEOC (Answer ¶ 5), but did admit that "[a]ll conditions precedent to the institution of this lawsuit have been fulfilled in that it is timely and that plaintiff has exhausted all administrative remedies." (*Id.* ¶ 7). Willow Springs has now moved for summary judgment on Simmons' complaint. [Dkt 18.]

---

[12] Willow Springs admitted that in its answer to the complaint. *See* Def.'s Answer ¶ 6. However, no notice of right to sue dated December 10, 2002 was included in any of the parties' exhibits. Instead, a notice of right to sue dated October 24, 2003 – 10 months *after* Simmons filed his complaint – was included in the exhibits. (*See* Pl.'s LR App. Ex. L, Notice of Right to Sue.) For reasons which will be discussed further herein, the date on which the right to sue notice was issued does not affect the outcome in this case.

## LEGAL STANDARD

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. The non-moving party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id.* *See also Winskunas v. Birnbaum*, 23 F.3d 1264 (7th Cir. 1994) (non-moving party is required to present evidence of "evidentiary quality" (i.e., admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating the existence of a genuine issue of material fact). "[N]either 'the mere existence of some alleged factual dispute between the parties' . . . nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (quoting *Anderson*, 477 U.S. at 247 and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-

12

moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Willow Springs bases its motion for summary judgment on two arguments: (1) that Simmons' complaint is untimely; and (2) that no evidence exists to support Simmons' Title VII claim. (Def.'s Mot. at 1-2; Def.'s Mem. at 3-5.)[13]

### A.     Timeliness of the EEOC Charge and Complaint

Willow Springs argues that the filing of Simmons' complaint on December 24, 2002 was untimely. (Def.'s Mem. at 3.) In support of its argument, Willow Springs incorrectly asserts that Simmons had 300 days from the date of the alleged unlawful employment action within which to file his lawsuit, and that more than 300 days had elapsed. (*Id.*) Willow Springs identifies January 14, 2002 as the date of the alleged unlawful employment action, which is the date that Simmons submitted his second application.[14] In its Reply brief, Willow Springs asserts that "January 2002"

---

[13] Willow Springs also asserted a third argument in its motion for summary judgment, namely, that Simmons could not maintain suit against the "Village of Willow Springs Police Department," as that entity is a municipal department which cannot be sued apart from the Village of Willow Springs. (Def.'s Mot. at 2; Def.'s Mem. at 5-6.) In response, Simmons filed a motion to amend the pleadings to name the "Village of Willow Springs" as the defendant, which the court granted on February 4, 2004. [Dkt 22, 23.] Based on the court's order allowing that amendment, Willow Springs withdrew its argument that the defendant was an entity that could not be sued. (Def.'s Reply at 1.)

[14] More specifically, Willow Springs identifies January 14, 2002 as the date on which Simmons "alleged activities by the Defendant in conjunction with an application of his for employ [sic] with the Defendant." (Def.'s Mem. at 3.)

(and not necessarily January 14, 2002) is the appropriate date from which the 300-day count should begin. (Def.'s Reply at 1.)

It is well-settled that Title VII plaintiffs must comply with two filing deadlines: first, an EEOC charge must be filed within 180 days (or, in deferral states like Illinois which have their own agencies with the authority to administer these complaints, 300 days) of the alleged unlawful employment practice; and, second, a complaint must be filed in court within 90 days of receiving a right to sue notice from the EEOC. 42 U.S.C. § 2000e-5(e)(1), (f)(1); *see also Gilardi v. Schroeder*, 833 F.2d 1226, 1229-30, 1233 (7th Cir. 1987) (discussing 300-day and 90-day requirements); *EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 968-70 (7th Cir. 1996) (discussing 300-day requirement); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 662 (7th Cir. 1997) (discussing 300-day requirement); *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 849-50 (7th Cir. 2001) (discussing 90-day requirement); *Brown v. Illinois Dept. of Public Aid*, No. 02 C 7781, 2004 WL 1157820 at *2 (N.D. Ill. May 21, 2004) (Bucklo, J.) (discussing 90-day requirement). Notably, the 300-day period begins to run on the date that the adverse employment decision was *made* and *communicated* to the plaintiff. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990); *Warnick v. Flex-N-Gate Corp.*, No. 03-CV-578-LJM-VSS, 2004 WL 828224 at *3 (S.D. Ind. Mar. 12, 2004) (McKinney, J.); *see also Delaware St. College v. Ricks*, 449 U.S. 250, 257-58 (1980) (holding that claim accrued at time employee was denied tenure).

Under that authority, it is clear that Simmons' EEOC charge was timely filed. Simmons submitted his second application for employment on approximately January 14, 2002. (Pl.'s LR Resp. ¶ 4; Simmons Dep. at 28-30; Wiseman Dep. at 29, 36-37; Def.'s Mem. at 1.) Simmons' EEOC charge, filed on September 3, 2002, would have been timely even if the period began to run

14

on January 14, 2002. Specifically, 300 days from January 14, 2002 is November 10, 2002. However, the 300-day period began running sometime *after* January 14, 2002, because Simmons could not reasonably have known on the very date that he submitted his application that he would not be hired. In fact, construing the facts in favor of Simmons, the opposite is true as Simmons was allegedly given the impression that he *would* be hired on the day he submitted his application. *See* Simmons Dep. at 40-42, 59. In any event, Simmons' EEOC filing was timely.

Simmons' complaint was also timely filed. As mentioned, Simmons was required to file his complaint within 90 days from the date on which he received the right to sue notice from the EEOC. In its answer to the complaint, Willow Springs admitted an allegation that the EEOC issued a notice of right to sue on December 10, 2002. (Answer ¶ 6.) Based on that date, Simmons would have been well within the 90-day filing requirement, since he filed his complaint on December 24, 2002. In fact, only 14 days would have passed.

However, the record reveals (and the parties admitted at oral argument on the present motion) that although Simmons' attorney requested a right to sue notice on November 13, 2002, the EEOC did not issue a right to sue notice until October 24, 2003. (Pl.'s LR App. Ex. L, Right to Sue Request at 1-2.)[15] Thus, Simmons actually filed his suit *before* he received a right to sue notice from the EEOC. Because he did, his complaint "may have been subject to dismissal at any time prior to [his] receipt of [the] right to sue letter." *Perkins v. Silverstein*, 939 F. 2d 463, 471 (7th Cir. 1991); *see also Worth v. Tyer*, 276 F.3d 249, 259 (7th Cir. 2001) (same). However, it is too late for that

---

[15] The EEOC issued a "Determination" on December 10, 2002, inviting the parties to reach resolution of the matter by participating in conciliation efforts with the EEOC. (Pl.'s LR App. Ex. Q, Determination at 1-2.) However, it did not issue a right to sue notice in conjunction with that Determination on that date.

now, as Simmons' receipt of the EEOC right to sue notice "after the complaint had been filed, but before it had been dismissed, effectively cured the deficiency" in the complaint. *Id.* (citations omitted). *See also Peters v. Renaissance Hotel Oper. Co.*, 307 F.3d 535, 551 (7th Cir. 2002); *Degen v. American Assn. of Oral & Maxillofacial Surgeons*, No. 93 C 4879, 1994 WL 13754 at *2 (N.D. Ill. Jan. 14, 1994) (Moran, J.).

Thus, neither the filing of the Simmons' EEOC charge on September 3, 2002 , nor the filing of his complaint in federal court on December 24, 2002 is a basis for granting Willow Springs summary judgment.[16]

## B.    Simmons' Discrimination Claim

Title VII of the Civil Rights Act of 1964 provides: "It shall be an unlawful employment practice for an employer--to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a). A plaintiff may meet his burden of proof under Title VII by offering either direct proof of discriminatory intent or by proving disparate treatment through the indirect, burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir. 2001). *See also Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1044 (7th Cir. 2000). Under either method, Simmons must produce sufficient evidence to allow a jury to infer that race was a motivating factor

---

[16] At oral argument, Willow Springs essentially conceded that its argument regarding the timeliness of the complaint was without merit, and explained that it had asserted the argument based on a mistaken understanding of the facts.

in Willow Springs' decision not to hire him. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir. 1995). In addition, under either method Simmons must show that he applied for an available position as a part-time officer. If he did not apply for such position, or such position was not available, he could not possibly prevail on his failure to hire claim. *See Dominicak-Brutus v. Urban Prop. Servs. Co.*, 217 F. Supp. 2d 911, 919 (N.D. Ill. 2002) (analyzing as initial matter in discriminatory failure to promote case whether plaintiff sought position at issue and whether there were any such positions available); *King v. Village of Gilberts*, No. 01 C 1901, 2002 WL 1559629 at *3 (N.D. Ill. July 16, 2002) (Kennelly, J.) (noting that "the absence of any vacant positions can protect an employer from [a failure to hire] discrimination claim"); *Morgan v. Federal Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 109 (D.D.C. 2001) ("Absent a vacancy, plaintiff simply cannot argue that he was the victim of discrimination."). Those threshold issues will be addressed before moving on to discuss the parties' evidence under the direct or indirect methods.

## 1. Whether Simmons Applied for a Position as a Part-time Officer and Whether Any Such Positions Were Available

### (a) Simmons' Application

Willow Springs argues that Simmons cannot establish that he actually "applied" for a position with the Willow Springs police department, arguing: (1) that by merely asking an officer with the police department (Wiseman) to forward his resume to Chief Schultz, Simmons did not follow "the appropriate avenue to submit [an] application," and (2) that Schultz is not responsible for the hiring of new officers, *i.e.*, Schultz is not the "decisionmaker." (Def.'s Mem. at 4-5, 6) (citing Def.'s LR Stmt. ¶¶ 4, 13-14.) Regarding the first point, Willow Springs argues that applications

were to be filed with the clerk's office, which Simmons did not do. (Def.'s Reply at 2) (citing Limas Dep. at 18.) Regarding the second point, Willow Springs argues that "although the chief played a large role in the [application] process, the procedure did not begin and end on his desk;" rather, "the hiring decision was made by the Village Board and Mayor." (*Id.*) (citing Limas Dep. at 11-12, 41.)

Simmons responds that both of his employment applications were forwarded to, and ultimately reached, Schultz – the first one by Wiseman, and the second one by Lieutenant Lynn. (Pl.'s Mem. at 5) (citing Pl.'s LR Stmt. ¶¶ 22-26.) Simmons also disputes Willow Springs' contention that Chief Schultz was not a decisionmaker, pointing out that Schultz designated applicants "qualified" or not qualified (and applicants were only recommended to the Village Board if they received the recommendation of "qualified"), and Schultz told Simmons in the parking lot that he would be hired. (*Id.* at 6 (citing Pl.'s LR Stmt. ¶¶ 47-50); Sims Dep. at 23-24.) The parties agree that it was Chief Schultz alone who made recommendations to the Village Board regarding applicants. (Pl.'s LR Stmt. ¶ 38; Def.'s LR Resp. ¶ 38.)

Simmons has provided sufficient evidence to allow a reasonable jury to conclude that he applied for a part-time officer position. The evidence indicates that there were no written procedures with respect to applying for part-time officer positions and that Simmons' submission of his application to Wiseman would not preclude him from being considered for employment. In addition, although Willow Springs argues that Schultz never received Simmons' applications (*see* Def.'s LR Stmt. ¶¶ 16, 22, 25; Schultz Dep. at 71-72), there is evidence to support the finding that Simmons' applications did in fact reach Chief Schultz. For example, Wiseman testified that he took the employment application to Chief Schultz and "hand[ed] it to him" and that Schultz later indicated he had either misplaced or lost it, and Lynn testified that he either handed Simmons' application to

Chief Schultz or put it in his office or handed it to his aide, because employment applications were always forwarded to Chief Schultz. (Wiseman Dep. at 25-27, 29, 44-45; Lynn Dep. at 26.) *See also* Wiseman Dep. at 36-37; Def.'s LR Resp. ¶ 25; Pl.'s LR Resp. ¶ 6; Pl.'s LR Stmt. ¶ 22. Also, Lynn testified that he believed Schultz received the application based on a conversation between them in which Schultz acknowledged Lynn's comment that Simmons seemed like a "pretty good guy." (Lynn Dep. at 29.) Moreover, there is evidence to show that Chief Schultz was aware of the fact that Simmons had applied for a position and was in fact considering him for the position. For example, Simmons testified that Chief Schultz asked him in the parking lot if he would be available to work weekends and holidays (Simmons Dep. at 40-41, 59), and Sims and Wiseman testified that Schultz told Simmons at that time that he was going to hire him (Sims Dep. at 23-24; Wiseman Dep. at 38-39). In addition, according to Wiseman, Schultz had left a message for Simmons regarding his application, and Simmons testified that he was told by Schultz that he would be hired after some badges came back. (Wiseman Dep. at 28, 46; Simmons Dep. at 43, 59).

Conversely, Willow Springs has presented very little evidence to show that Simmons did not apply for the job – or could not be considered for the job – merely because he gave his applications to Wiseman instead of submitting them to the clerk's office. Willow Springs cites Limas' testimony for the point that applications had to be filed with the clerk's office, but Limas testified that such a requirement is not even set out in writing. (Limas Dep. at 18.) There is simply no evidence that applicants were precluded from consideration if they did not file their applications with the clerk's office. Indeed, Chief Schultz testified on the issue as follows:

> Q.     And was there a certain place that the applicant had to return the application to or certain individual?

A.    Well, if they returned it to the Village of Willow Springs at 8156 Archer, it
      would be given to the police department. And if it was brought to the police
      department, it would be brought – given to my secretary.

Q.    Would your secretary then forward it to you?

A.    Yes.

(Schultz Dep. at 44.) *See also* Lynn Dep. at 26. The evidence supports the conclusion that an

applicant would not be precluded from consideration simply because he gave his application to an

officer to forward to the Chief or submitted it somewhere other than the clerk's office. Rather, the

evidence indicates that regardless of where or to whom an application was submitted, it would be

forwarded to and considered by the Chief.

In addition, Willow Springs has not presented sufficient evidence to preclude a finding that

Schultz was a "decisionmaker" with respect to the hiring of part-time officers. It is undisputed that

Chief Schultz alone determined whether an applicant was "qualified" or not, and that only

"qualified" applicants were recommended to the Village Board for final determination. (Pl.'s LR

Stmt. ¶¶ 34, 37-38.) In other words, if Chief Schultz did not recommend an applicant, that applicant

could not be hired. Moreover, there is testimony that the Chief's recommendations to the Board

were basically "rubber stamp[ed]." (Carr Dep. at 21-22.) Indeed, it is undisputed that none of

Schultz's recommendations during his six years as Chief were ever rejected by the Village Board.

(Def.'s LR Resp. ¶ 39; Schultz Dep. at 52-53; Wiseman Dep. at 33.) Under Seventh Circuit case

law, that evidence tends to show that Schultz was in fact an actual decisionmaker. *See Rogers v. City

of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (stating that "[a] decisionmaker is the person

responsible for the contested decision," and "if there were competent evidence that the [official

20

decisionmaker] had acted as [the recommender's] 'cat's-paw' and rubber-stamped his recommendation, we would consider [the recommender] to be the decisionmaker").

Thus, as an initial matter, Simmons has provided sufficient evidence to allow a reasonable jury to find that he applied for a position as a part-time officer, and that his application was received by the decisionmaker.

### (b)    Availability of Part-time Police Officer Positions

Willow Springs also argues that it was not seeking applications (or there were no "openings") for part-time officer positions at the time Simmons submitted his resume to Wiseman. (Def.'s Mem. at 5, 6.) In response, Simmons points to testimony from Wiseman and Schultz that there was "a lack of manpower" and that part-time positions were "desirable" and available on a "continual" basis. (Pl.'s Mem. at 7) (citing Def.'s LR Resp. ¶ 21.) For instance, Wiseman testified that the Chief was "constantly bringing in part-time police officers . . . to fill in voids" and that there was no "set number of positions." (Wiseman Dep. at 21-22, 33.) Wiseman further testified that he had encouraged Simmons to apply for the job after becoming aware "that the chief was again *looking* for part-time patrol officers." (Wiseman Dep. at 24) (emphasis added.) In addition, Willow Springs admits that applications were accepted on a rolling basis, and Wiseman testified that positions were offered based on "whom [the Chief] wanted." (Def.'s LR Resp. ¶ 20; Wiseman Dep. at 33.) Moreover, as discussed above, there is evidence that Simmons was actually being considered for a part-time officer position, indicating further that such positions were available. *See, e.g.,* Simmons Dep. at 40-41, 43, 59; Wiseman Dep. at 28, 46. Because there is evidence in the record to establish that part-time positions may have been available (and applications for such positions considered) on a continual basis, whether or not there were any "official" openings, this is a dispute that must be

resolved by the jury.

Viewing the evidence in the light most favorable to Simmons, a reasonable jury could conclude that Simmons did apply for a position as a part-time officer, that his application was considered by a decisionmaker, and that there were part-time police officer positions available at the time he submitted his application. Accordingly, the court will consider whether there is evidence of discrimination in the Village's failure to hire Simmons.

### 2.      Proof of Discrimination

Willow Springs denies any discrimination on the basis of race. *See, e.g.*, Def.'s LR Resp. ¶¶ 40-42. From the briefs, it was not entirely clear whether Simmons intended to rely on the direct or indirect method of proof to prove his claim of race discrimination. At oral argument, however, Simmons' attorney stated that Simmons was proceeding under the both direct and indirect methods.

### (a)      Direct Method of Proof

To prevail on his claim of discrimination under the "direct" method of proof, Simmons must show, by way of either *direct* or *circumstantial* evidence, that Willow Springs' decision not to hire him was motivated by an impermissible purpose, such as his race. *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Huff. v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997); *Grace v. Ansul, Inc.*, 61 F. Supp. 2d 788, 791 (N.D. Ill. 1999); *Rogers*, 320 F.3d at 754.[17]

Direct evidence of discrimination "is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or

---

[17] Although this method is often referred to as the "direct" method of proof, a plaintiff may produce evidence of either the direct or circumstantial kind under this method. *Rogers*, 320 F.3d at 754; *Grace*, 61 F. Supp. 2d at 791 n. 5.

presumption." *Davis v. Con-Way Transp. C. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (quoting *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003)); *see also Volovsek v. Wisconsin Dept. of Agriculture*, 344 F.3d 680, 689 (7th Cir. 2003) (quotation omitted); *Rogers*, 320 F.3d at 753. Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers*, 320 F.3d at 753 (quotation omitted); *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003); *see also Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). A proffer of direct evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Grace*, 61 F. Supp. 2d at 792 (quoting *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997)). "[I]nappropriate but isolated comments that amount to no more than 'stray remarks' in the workplace will not do." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997); *see also Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (explaining that a "stray remark" is a derogatory remark unrelated to the employment decision at issue). Rather, "isolated comments must be contemporaneous with the adverse action or causally related to the applicable decision-making process." *Conley v. Village of Bedford Park*, 215 F.3d 703, 711 (7th Cir. 2000). This type of evidence is rare. *Volovsek*, 344 F.3d at 689; *Rogers*, 320 F.3d at 753; *Venturelli*, 350 F.3d at 599; *Grace*, 61 F. Supp. 2d at 791.[18]

A plaintiff can also prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the

---

[18] Some cases also hold that "[r]emarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." *See Sanghvi v. St. Catherine's Hosp., Inc.*, 258 F.3d 570, 574 (7th Cir. 2001) and cases cited therein.

decisionmaker." *Rhodes*, 359 F.3d at 504 (quoting *Troupe*, 20 F.3d at 737); *see also Volovsek*, 344 F.3d at 689; *Rogers*, 320 F.3d at 753. That circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). It must also be "directly related to the employment decision." *Venturelli*, 350 F.3d at 602 (quotation omitted).

If a plaintiff can show that an illegal criterion such as race was a motivating factor in the adverse employment action (here, failure to hire), the burden shifts to the employer to demonstrate that it would have made the same decision even if the illegal criterion had not been considered. *Venters*, 123 F.3d at 973 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). "The persuasiveness of that showing will normally be for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Id.* However, even if the employer succeeds in proving that it would have made the same decision absent the illegal consideration, the plaintiff may still obtain declaratory and injunctive relief and attorney's fees. *Id.* at 973 n. 7. Thus, "once the plaintiff has presented evidence reasonably suggesting that [his] . . . race . . . played a motivating role in [the adverse employment action], summary judgment will rarely (if ever) be appropriate." *Id.*

### (b)   Simmons' Evidence Under the Direct Method

Simmons asserts that "Chief Schultz's discriminatory intent in this case is evident in his use of racial epithets within the work environment, especially as it relates to the hiring process." (Pl.'s Mem. at 8.) As discussed above, Simmons described those alleged remarks and epithets with specificity. *See* Pl.'s Mem. at 8; *see also* Pl.'s LR Stmt. ¶¶ 40-44, 46-47; Wiseman Aff. at 1; Sims

Aff. at 1; Carr Aff. at 1; Wiseman Dep. at 54, 55, 71; Sims Dep. at 40, 57; Gardner Dep. at 45, 52-53.

Although some of the comments at issue could be characterized as nothing more than "stray remarks," at least two of the alleged statements relate specifically to the hiring of African Americans. The "I will never hire a [racial epithet]" comment was allegedly made on two separate occasions, once prior to Simmons' applications, and once eight months after Simmons submitted his second application. (Wiseman Aff. at 1; Sims Aff. at 1.) The comment regarding "keep[ing] the UPS [racial epithet] [from applying]" was made approximately 16 months prior to Simmons' applications. (Carr Aff. at 1.) In addition, all of the discriminatory statements were allegedly made by Chief Schultz, the decisionmaker. *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir. 1996) (stating that direct evidence "must relate to the motivation of the decision maker responsible for the contested decision"); *Rogers*, 320 F.3d at 754 (stating that a decisionmaker may include individuals whose recommendations are merely "rubber-stamped").

Chief Schultz denied making any of those remarks *See* Def.'s LR Resp. ¶¶ 40-44, 46-47; Schultz Dep. at 77-78, 80-83. Other witnesses supported Schultz' denial. *See* Limas Dep. at 32, 40; Lynn Dep. at 21.) However, there is corroborative evidence from persons other than the plaintiff regarding the statements. For example, more than one officer attested to having heard Schultz say that he would "never hire a [racial epithet];" Gardner testified that she believed Schultz intended to have African Americans arrested; and Sims testified that Schultz had made comments regarding "ghetto cruisers," which he took to mean vehicles containing African Americans. (Gardner Dep. at 45, 52-53; Pl.'s LR Stmt. ¶¶ 40-44, 46-47; Wiseman Aff. at 1; Sims Aff. at 1; Wiseman Dep. at 54-55, 71; Sims Dep. at 40, 57; Carr Aff. at 1.) The totality of the evidence, at a minimum, "compos[es]

25

a convincing mosaic of discrimination against the plaintiff," which "may allow [him] to surpass the summary judgment hurdle" on the issue of whether he was not hired because of his race. *Hasham*, 200 F.3d at 1044.

Although Schultz denies making the alleged statements (and his denials are supported by Lynn's and Limas' testimony), and the credibility and motive of the officers who provided the evidence of Schultz's discriminatory intent may be at issue, it is inappropriate to weigh conflicting deposition testimony on summary judgment. *Payne v. Pauley*, 337 F.3d 767, 772-73 (7th Cir. 2003). Whether the statements were actually made, and the import of those statements, is for a jury to decide. *Volovsek*, 344 F.3d at 690. Thus, summary judgment cannot be granted based on Simmons' evidence under the direct method of proof. *See id.* (reversing grant of summary judgment based on circumstantial evidence under direct method of proof where decisionmaker made derogatory comment close in time and in substance to the alleged act of discrimination); *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F. 3d 627, 632 (7th Cir. 1996) (finding that comments made by top policymakers in company corroborated plaintiff's case under direct method of proof); *Venters*, 123 F.3d at 973-74 (holding that remarks made constituted direct evidence of discrimination); *Perry v. Community Action Servs.*, 82 F. Supp. 2d 892, 895 (N.D. Ill. 2000) (denying summary judgment where a "reasonable trier of fact could conclude that [decisionmaker's] statement, which dealt explicitly with employment and was made by an aggressive Chairperson who was admittedly taking a more active role in the management of CASI, was probative of discrimination"); *Grace*, 61 F. Supp. 2d at 792-93 (finding that plaintiff's evidence of discrimination was sufficient to defeat summary judgment under the direct method); *King*, 2002 WL 1559629 at *2-3 (denying summary judgment where plaintiff had direct evidence of discrimination); *EEOC v. Williams Electronics*

*Games, Inc.*, 930 F. Supp. 1209, 1213 (N.D. Ill. 1996) (denying motion for partial summary judgment where evidence was sufficient to support applicant's direct evidence case of discrimination).

### (c) Whether Willow Springs' Would Have Made the Same Decision Even if Illegal Criterion was not Considered

As mentioned above, because Simmons has presented evidence of a discriminatory motive under the direct method of proof, Willow Springs may demonstrate that it would have taken the same action (*i.e.,* not hired Simmons) even if the proscribed criterion had played no role in the decision. *Venters*, 123 F.3d at 973. If it succeeds in this task, Simmons' relief would be limited, although Simmons could still obtain declaratory and injunctive relief and attorney's fees. *Id.* at 973 n. 7. Willow Springs stated that it did not hire or consider Simmons for employment because he did not formally submit an application (that is, he submitted his application to Wiseman rather than to the clerk's office), and Schultz never received Simmons' application. (Def.'s Mem. at 1-2, 4-6; Def.'s Reply at 2; Pl.'s LR Resp. ¶ 6.) At oral argument, Willow Springs further asserted that it did not hire Simmons because Schultz's goal had been to "do away" with part-time officers due to budgetary constraints.

While Willow Springs' argument that Simmons was not hired for a non-discriminatory reason is not without support, including the fact that Simmons never followed up with Schultz after their last conversation, the dearth of Simmons' evidence regarding whether any other part-time officers were hired around the time that Simmons applied (as discussed in more detail below), and Schultz's vehement denials that he ever made any of the alleged discriminatory comments, Willow Springs has not eliminated material questions of fact. The court cannot say "without reservation"

that a reasonable finder of fact would be compelled to credit Willow Springs' position on this point. *Venters*, 123 F.3d at 973. Simmons presented evidence on the issues of whether he "applied" by submitting his application to Wiseman rather than the clerk's office, and whether his application was received by Schultz. There is also evidence to cast doubt on Willow Springs' argument that it did not hire or consider Simmons for employment because of budgetary constraints. Although Schultz testified that although his goal had been to "do away" with part-time officer positions, he also testified that goal had been "shelved" at the time he met with Simmons, and part-time positions were still considered "desirable." (Pl.'s LR Stmt. ¶ 21; Schultz Dep. at 60-61.) In addition, Simmons testified that Schultz had told him that he would be hired after "some badges came back." (Pl.'s LR Resp. ¶ 6; Simmons Dep. at 43, 59-60.) Thus, summary judgment is not appropriate in this case. *See Venters*, 123 F.3d at 973 n. 7 (stating that "once the plaintiff has presented evidence reasonably suggesting that [his] . . . race . . . played a motivating role in [the adverse employment action], summary judgment will rarely (if ever) be appropriate").

Because summary judgment for Willow Springs is precluded by the evidence that Simmons has presented under the direct method of proof, there is no need to address the parties' arguments under the *McDonnell Douglas* burden-shifting analysis. *See Lang v. Illinois Dept. of Children & Family Servs.*, 361 F.3d 416, 421 (7th Cir. 2004); *Anderson v. Bd. of Educ. of City of Chicago*, No. 01 C 3634, 2003 WL 21468628 at *4 n. 2 (N.D. Ill. June 20, 2003) (Gettleman, J.); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court

despite the unavailability of direct evidence.'").[19]


## C.    Willow Springs' Request To Strike

Finally, in its Local Rule Response, Willow Springs made an off-handed "motion" to strike

a statement made by Lisa Gardner at her deposition, which was included by Simmons in his Local

Rule 56.1 Statement of Additional Facts. (*See* Pl.'s LR Stmt. ¶ 48; Def.'s LR Resp. ¶ 48.) The

statement at issue is: "Officer Gardner is of the opinion that Chief Schultz is racially insensitive and

that he would discriminate against African Americans." (Pl.'s LR Stmt. ¶ 48) (citing Gardner Dep.

at 54.) In its Response, Willow Springs admitted that Gardner made the statement at her deposition,

but denied its veracity and relevance, and "moved to strike it" as unqualified expert opinion

testimony. (Def.'s 's LR Resp. ¶ 48.)

As a threshold matter, an off-handed "motion" buried in a Local Rule response is not a proper

vehicle to bring any matter to the court's attention. All of the parties are warned that any motion

---

[19] It should be noted, however, that there is a significant question whether Simmons could have established all of the elements of the *prima facie* case under the *McDonnell Douglas* burden-shifting analysis; particularly, whether Simmons could have established the fourth element, *i.e.*, that Willow Springs filled the position with someone outside Simmons' protected class or continued to seek applicants from persons of Simmons' qualifications. Although Simmons argues that at least two Caucasian individuals were hired as part-time officers after he submitted his applications (Pl.'s Mem. at 7), he does not have any evidence regarding who was hired (indeed, he admits to never inquiring as to whether any part-time officers were hired after he applied (Pl.'s LR Resp. ¶ 8)), and his evidence as to when those unidentified individuals were hired is weak, at best. In contrast, Willow Springs has provided evidence indicating that Schultz did not hire any part-time officers after November 2001, which was before Simmons applied for the job. (Limas Dep. at 35.) *See Venturelli*, 350 F.3d at 603 (applicant failed to establish fourth element of *prima face* case in discriminatory failure to hire case); *Katial v. Massachusetts Mut. Life Ins. Co.*, No. 99-CV-2593, 2002 WL 1632556 at *6-7 (N.D. Ill. July 22, 2002) (McKeague, J.) (same).

must be properly noticed and presented, so that the court and the opposing party may have an opportunity to address it properly. A reference to "moving to strike" in a response is not sufficient to preserve any objection. However, in ruling on Willow Springs' motion for summary judgment, the court disregarded Gardner's opinion testimony as to whether Chief Schultz was racially insensitive. Therefore, Willow Springs' " motion" to strike is denied as moot. *See Randall v. Unitech Sys., Inc.*, 243 F. Supp. 2d 822, 825 n. 2 (N.D. Ill. 2003) (denying as moot a motion to strike because "[i]n granting the defendant's motion for summary judgment, the court did not consider this evidence").

## CONCLUSION

For the reasons discussed above, Willow Springs' Motion for Summary Judgment is denied.

IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

September 9, 2004